• Peaeson, J.
 

 For the purpose of inducing individuals to subscribe for the amount of stock necessary to secure the charter, the gentlemen who felt the deepest interest in the success of the enterprise, and to whose exertions the North Carolina rail-road owes its existence, in their speeches and in the conventions which they procured to meet, held out the assurance that the company, when organized, would take care to relieve the subscribers of their stock by requiring those who contracted to do work on the road, to take stock in payment of one half of the amount of the price of their work.
 

 The company, at its first meeting, instructed the directors
 
 *150
 
 to cany into effect tlie assurances which had been held out to the subscribers'for stock, and in’tlie language of tlie company in its answer, “ tlie substance of these resolutions, passed at different times and conventions, was, that in letting out tlie contracts, the contractors were to be
 
 required to take stock as far as it was practicable to get them to do so.”
 

 In pursuance of these instructions, the president and directors, in the advertisements for letting out contracts, made this stipulation ; tlie contractors
 
 “
 
 receiving in payment on their contracts,
 
 one-half in stock of the
 
 road, the other half in cash.”
 

 At tlie letting of contracts in Hillsborough, Johnson, the intestate of the defendant Jones, proposed to contract for the grading and culverts upon sections 17, 18, 19, 20, of the second division of tlie road, talcing in payment 4-0 shares which he had subscribed for, and 40 shares which William A. Graham had subscribed for ; but he was informed that 80 shares would not equal one-lialf of the amount, and that according to the terms of the letting, he could not get the contract, unless lie took more stock. Accordingly lie entered into a contract -which contains, among others, this clause, to wit,
 
 “
 
 one-lialf to be paid in cash, &c., the other half to be applied in payment of 40 shares of stock subscribed for by said Johnson ; 40 ditto subscribed for by William A. Graham ; 10 ditto which Graham takes for Edjnund títrudwick, and the balance to be applied
 
 to the payment of instalments due upon the stock of Richard Ashe, or so much as may be necessary to
 
 make,
 
 with the foregoing, one-half of the whole contract”
 

 Johnson, with the assistance of Graham, who furnished a number of hands &c., completed liis contract; and the amount to which he is entitled to be paid, according to the terms of his contract, is $24,000 (in round numbers.)
 

 The plaintiff insists that one-half of this sum ($24,000) was to be paid in stock ; and admitting $9,000 to be first applied to pay for the stock of Johnson, Graham and Strudwick, there remains a balance of $3,000 to be applied to the payment of his stock. He alleges that he had taken stock to the amount of $8,000, and that Johnson, finding he could not get the con
 
 *151
 
 tract for which lie liad made jiroposals, without liaving more stock than lie and Graliam owned, agreed with him to take of his stock the amount that might he necessary to make np the deficiency, and that in pursuance of this agreement, the contract was entered into with the clause above set out. lie says; after this agreement with Johnson, he rested easy, under the belief that he had been relieved from a part of 'his large subscription, and that Johnson was to be substituted in his place and was to take the stock and pay for it, under his contract. He was afterwards surprised to find that Johnson was not disposed to carry out this agreement in good faith, and that the company intended to pay over to Johnson the amount due under his contract without retaining for any part of the stock which the plaintiff had subscribed for, and which Johnson had agreed should bo paid out of the funds in the hands of the company; or in other words, which Johnson had agreed to take off his hands. The prayer is, that stock standing in the name of the plaintiff, corresponding with one-lialf of the excess due on the contract, shall be paid for out of the funds in the hands of the company and be transferred from the plaintiff to the defendant Johnson; that an account be taken to ascertain the true amount; and in the mean time, that the company be enjoined from paying over, and Johnson from receiving, the funds still remaining in the hands of the company.
 

 The answer of the company admits the general facts alleged in the bill, but denies any knowledge of the terms of the private agreement., between the plaintiff and Johnson, and avers that upon being notified of the misunderstanding between them as to the terms of their agreement, the company made known to them an intention to pay over the fund to Johnson, and let them “ fight it out.”
 

 The company was induced to take this course because it was known to the president and the chief engineer, -who made the contract with Johnson, that he was at the time, excited by ardent spirits, and although sober enough to enter into the general contract with the company, yet it is probable he and
 
 *152
 
 tlie plaintiff did not understand each other in regard to the precise terms of their private agreement; and because the plaintiff himself afterwards became a contractor to an amount sufficient to absorb all of the $8,000 for which lie had subscribed, and in settlement of the contract, the whole amount of his subscription was included, although he protested and required them to exonerate him from an amount of his stock sufficient to Jill up the contract of Johnson.
 

 The defendant, Jones, as administrator of Johnson, also admits the general facts alleged in the bill. He denies any personal knowledge of the terms of the agreement, between the plaintiff and his intestate, if in fact there vras any agreement, as to which he holds the plaintiff to strict proof. He insists, “ that it could not have been the intention of his intestate to take the stock of the plaintiff off his hands at par; because as he alleges, the stock was then greatly under par, and his intestate “ not being a professional contractor, did not desire any greater contract than one estimated at double the value of his own stock and that of Mr. Graham, (who had agreed to do one-lialf of the work, in order to pay for his stock,)
 
 it being a prevalent opinion at the
 
 time,
 
 that a
 
 contractor,
 
 with a contract yielding double the amount of his
 
 subscription,
 
 might pay the expenses of the worlc from the
 
 money, and the stock was then not worth par, and no prudent man would have purchased it at that price; the rate of depression may be judged of from the fact, that the sub-contractors, under Johnson, allowed a discount of 25 per cent, to obtain casAfor their -work.” So the defendant denies according to the “ best of his knowledge and belief,” that his testator ever agreed to purchase the stock of the plaintiff, or any part thereof, as is charged in the bill. He believes the amount of the agreement was, cither, .that Johnson was to become paymaster to the company, for a part of plaintiff’s stock, “ leaving the plaintiff liable to him for the amount thus paid to his use,” or that the plaintiff was to contribute hands, &c., and aid in doing the work, and thus pay for his stock, as Mr. Graham did. In support of this last suggestion, he avers that his intestate offered to allow plain
 
 *153
 
 tiff to do work on a part of his contract and the plaintiff declined doing so. Defendant also alleges, that the whole of the plaintiff’s stock was worked off by himself, in a contract amounting to some $28,000, which he had obtained upon the ground of this very stock; so, as he insists, the plaintiff has had the benefit of working off the whole of his stock, and can claim nothing by reason of any agreement he had made with Johnson, in regard to a part of it.
 

 The equity of the plaintiff is an emanation or deduction from an obligation, which was assumed by the gentlemen who were most active in procuring individual subscriptions for stock, and which was afterwards earned into effect by the president and directors acting under the "instructions of the individual stockholders, and was by them, according to their advertisement for contracts, made one of the terms of the letting ; that is to say, contractors were required to receive payment, one-lialf in cash, the other half in the stock of individual subscribers.
 

 It is apparent that such an obligation or undertaking on the part of the individual stockholders, was in direct contravention of the rights of the State; inasmuch, as the State was to furnish
 
 two:thirds
 
 of the funds for the construction of the road, and, although, not then represented, was to contribute two-thirds of the company’s capital. It was accordingly made a subject of anxious consideration by us, whether such an undertaking on the part of the individual stockholders, was not exposed to the objection of being against public policy, as tending to induce the officers of the company to allowT more to contractors than their work was worth
 
 in cash,
 
 in order to induce them to take individual stock in part payment, the result of which would necessarily prejudice the rights of the largest stockholder. The disclosure in the answer of the defendant, proves that it was the prevalent opinion at the time, “ that a contractor, with a contract yielding double the amount of his subscription,' might pay the expense of the work, from the money in other Avords, might make his stock clear; that is, things were in such condition, that the State, as Avas supposed, Avould
 
 *154
 
 pay all of the money required for the construction of the road, and yet individuals would own one-third of the stock! This disclosure together with the further fact, that contractors who took one-half in stock were allowed such prices, as to enable them to let out sub-contracts to be paid in cash at a discount of 25 per cent, is really startling.
 

 . If the original undertaking was .against public policy, of course this Court could not, in any way, aid in carrying into effect an agreement growing out of this undertaking, or based upon it.
 

 After much reflection, we have come to the conclusion that this objection to our entertaining the cause, has been removed, by the concurring acts of the executive and legislative departments of the government. They have, from high considerations of
 
 public
 
 good, concurred in, approved of, and ratified the action of the individual members of the company in regard to the undertaking, with full notice; and it is proper to say, tha't the matter was at all times openly avowed and justified upon the ground of
 
 public good.
 
 The executive officers have caused the subscription on the part of the State to be paid ; and the Legislature, at its last session, appropriated one other million of dollars, to aid in the completion of a work which they deemed so important to the interests of the State.
 

 Ilis Honor in the Court below, a motion coming on to bo heard upon bill and answer, dissolved the injunction. In this there is error. The distinction between injunctions to stop an cxeration at law, where the defendant has by a judgment, established his legal right, and injunctions, in cases where there has been no adjudication of the rights of the parties at law, and consequently where both parties stand in this Court, upon an equal footing,
 
 oath against oath,
 
 and the Court is to dispose of the motion upon the whole matter taken together, is explained and settled,
 
 Purnel
 
 v.
 
 Daniel,
 
 8 Ire. Eq. 9;
 
 Caphart
 
 v.
 
 Mhoon,
 
 Busbee Eq. 30;
 
 Loyd
 
 v.
 
 Heath,
 
 ib. 39;
 
 McMeely
 
 v.
 
 Steel,
 
 ibid 240.
 

 In our case, there has been no adjudication of the rights of the parties. The plaintiff alleges the agreement was, that
 
 *155
 
 Johnson would take off his hands an amount of stock sufficient to fill his contract, and that Johnson’s motive for doing so, was "because he conld not otherwise get the large contract for which he had made proposals. The contract of Johnson,
 
 prima faoie¿
 
 supports this new of the transaction. Hie defendant, as administrator of Johnson, makes a formal denial of the agreement alleged by the plaintiff, and suggests that according to his information and belief, the agreement was, that the plaintiff should aid in the work so as to do a part, corresponding with his stock; or else, that the plaintiff was to pay his intestate,
 
 in
 
 cash, the amount of stock that his intestate should work out under his contract. This latter suggestion is not very probable, because there was no sufficient motive for the plaintiff to agree to pay
 
 cash
 
 for his stock, or a part thereof, wliereby he would forego the benefit of getting it off his hands upon much better terms, according to
 
 the un-dei'standdng,
 
 which, it is admitted, the president and directors of the company were carrying into effect in letting out contracts.
 

 So the question is, did Johnson agree to take off the plaintiff ’s hands so much of his stock as was necessary to fill his (Johnson’s) contract ? Or was it a part of the agreement that the plaintiff should furnish hands, &c., and do a corresponding portion of the work ? No decision can be made in regard to it, at this stage of the proceeding, and the injunction ought to have been continued until the hearing.
 

 It is said the bill shows no ground for coming into Equity, and the plaintiff had a remedy at Law for a breach of the agreement. The reply is, here is a specific thing, which one of the defendants has agreed to do, and here is a specific fund in the hands of the other defendant, who holds a covenant on the part of his co-defendant, taken in behalf of the plaintiff according to a prior understanding, and the possession of the fund puts it in the power, and makes it the duty of one of the defendants, to see that the agreement is carried into effect by the other. Again, it is said, Equity will not enforce the specific performance of an agreement to transfer or to accept
 
 *156
 
 stock. The reply is, that may he so in reference to government stock in England, which, like corn or flour, may be bought for the money in market at any time; but the doctrine has no application to rail-road stock.
 

 We
 
 incline to the opinion that neither of those objections is tenable, but do not now dispose of them definitely.
 

 In regard to the allegation that the plaintiff, after the alleged agreement with Johnson, took a large contract, and in that way absorbed the wrhole of the stock which he had subscribed for, according to the understanding and terms of letting, by reason whereof he impliedly waived any right to have a part of his stock worked off by Johnson, it is sufficient to. say, that is
 
 new
 
 matter, and rests upon a mere allegation of the defendants, to which the plaintiff has had no opportunity of replying. So it cannot be taken into consideration at this stage of the cause. Decretal order reversed; the injunction must stand over until the final hearing.
 

 Pee Cueiam. Decree accordingly.